UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **GARY GLENN,** | } |
| **Plaintiff,** | } |
| v. | } Case No.: 7:12-CV-03691-RDP |
| **AMERICAN UNITED LIFE INSURANCE COMPANY, et al.,** | } |
| **Defendants.** | } |

### MEMORANDUM OPINION

This case is before the court on the parties' Cross-Motions for Judgment as a Matter of Law (Docs. #28 & #30). The Motions (Docs. #28 & #30) have been fully briefed. (Docs. #29, #31, #35, #36, #37). For the reasons outlined below, Defendants' Motion (Doc. #30) is due to be granted, while Plaintiff's Motion (Doc. #28) is due to be denied.

**I.   Procedural History**

Plaintiff Gary Glenn ("Plaintiff") initiated this lawsuit on October 24, 2012 by filing a Complaint (Doc. #1) against Defendants American United Life Insurance Company ("American United") and Disability Reinsurance Management Services, Inc. ("DRMS") (collectively, "Defendants"). Plaintiff's Complaint set forth only one cause of action: wrongful denial of disability benefits in violation of the Employee Retirement Income Security Act ("ERISA") (Doc. #1 at ¶¶ 5-8). Defendants responded with an Answer (Doc. #11) on November 29, 2012, and, subsequently, provided the court with a copy of the Administrative Record (Doc. #16) (hereinafter, "AR"). Following a telephone conference on September 10, 2013, the court requested briefing on "whether the case can or should be decided on the administrative record

(and, if so, how it should be decided) or, alternatively, whether an evidentiary hearing is required." (Doc. #21). On November 25, 2013, Plaintiff filed a Motion for Judgment as a Matter of Law (Doc. #28), along with a Supporting Brief (Doc. #29). That same day, Defendants also filed a Motion for Judgment as a Matter of Law (Doc. #30), as well two Supporting Briefs (Docs. #31 & #32). On January 6, 2014, the parties filed Responses (Docs. #35 & #36) to their respective motions, and, a week later, Defendants filed a Reply (Doc. #37), rendering the parties' Cross-Motions (Docs. #28 & #30) properly under submission.

## II.     Findings of Fact

Prior to submitting his disability claim, Plaintiff served as Chief Executive Officer of Med Management, LLC. (AR at 907). At the time, Med Management maintained an employee benefits plan as part of a group insurance policy with Defendant American United, providing its employees with long-term disability benefits. (AR at 909-42). Defendant DRMS was responsible for administering claims under the policy. (Doc. #30, Ex. A at ¶ 3).

In July 2007, Plaintiff visited Dr. Thomas Wilson, a neurosurgeon, to whom he complained of neck pain, numbness in his right foot, and pain extending down his right leg. (AR at 328). These symptoms were consistent with Plaintiff's general back and spinal issues, which had been ongoing for a number of years. (*See, e.g.*, AR at 895-98). Dr. Wilson opined that Plaintiff was "symptomatic from foraminal stenosis at L5/S1 on the right," and suggested that Plaintiff consider a nerve root block may be a procedure to consider in the future. (AR at 328).

On February 18, 2008, Plaintiff underwent "selective nerve root blocks at L4, L5, and S1 on the right," in the hopes of addressing what his physician diagnosed as "1) Neuroforaminal stenosis; 2) Lumbar radiculopathy; and 3) Degenerative disc disease of the lumbar spine." (AR at 331). Shortly thereafter, in March 2008, Plaintiff presented to the hospital with "mental

aberration and personality change," noting that "[h]e had [recently undergone] an epidural block which was his third in the last year and a half." (AR at 868).  At that time, Plaintiff also complained of stress and "chest tightness." (*Id.*).  The radiology report conducted during his visit indicated that Plaintiff had a "very small bulging disc at the C7-T1 level in the midline . . . small bulging disc in the midline at C3-C4, C4-CU and C5-C6 disc levels [and] neural foramina are normal." (AR at 875).

The next month, Plaintiff saw his primary care physician, Dr. Guy Patterson. Dr. Patterson opined that Plaintiff's neurological symptoms were improving with current medication. (AR at 892).  However, three weeks later, Dr. Patterson indicated that Plaintiff may be bipolar, noting that he was experiencing racing thoughts and stress related to work, home, travel, and family. (AR at 891).  Shortly thereafter, Plaintiff presented to Dr. Patterson with depression, wide mood swings, grandiose ideas, and memory loss.  Dr. Patterson's impression at that time was that Plaintiff had bipolar disorder. (AR at 890).

On August 1, 2008, Plaintiff applied for long-term disability benefits under the group insurance policy. (AR at 908).  As part of his application for disability benefits, Plaintiff submitted an Attending Physician's Statement from Dr. Patterson. (AR at 905).  In that document, Dr. Patterson noted that the diagnosis affecting Plaintiff's ability to function was anxiety with manic symptoms. (*Id.*).  He reported Plaintiff had trouble focusing, was irritable, experienced euphoric highs, and had impaired decision making ability. (*Id.*).  When asked to identify a "Secondary diagnosis impacting function," Dr. Patterson listed degenerative disc disease with low back pain and right sciatica. (*Id.*).  Based on his conversations with Plaintiff, Dr. Patterson reported that Plaintiff was capable of performing at a sedentary level — walking and standing on occasion, sitting six-to-eight hours in an eight-hour work day, and occasionally

bending, climbing, reaching, kneeling, squatting, crawling, pushing/pulling, and lifting up to 10 pounds. (AR at 906). However, because he concluded that Plaintiff's cognitive function was impaired, Dr. Patterson advised him not to return to work. (*Id.*).

Plaintiff's claim for long-term disability benefits was approved, effective August 7, 2008, and benefits were issued in accordance with the policy's Mental Illness Limitation. (AR at 848).[1] In the award letter, DRMS plainly specified that benefits were being approved "based on [his] medical diagnosis of anxiety and manic disorder," but noted that it was aware that Plaintiff was "treating for a medical condition related to [his] lumbar spine." (*Id.*). To that end, DRMS stated that it would require updated medical information in order to assess Plaintiff's abilities in relation to his back condition. Despite its approval, DRMS promised a continuing investigation and explained as follows: "as it appears that you had previously worked with this condition, we will need to determine what changed to prevent you from continuing to work." (AR at 849). Because Plaintiff's benefits were granted under the policy's Mental Illness Limitation, they were only available for up to twenty-four months. (AR at 912).

By letter dated November 3, 2008, Plaintiff's therapist, James Cotton, conveyed the following opinion to DRMS: "At this point, my diagnosis would be 293.83 Mood Disorder due to a General Medical Condition. The chronic back pain has led to both anxiety and depression. At this time his GAF scale would be about 60. His depression and anxiety are exaggerated by his current inability to work." (AR at 788).

On November 10, 2008, Plaintiff contacted a DRMS representative by telephone, informing her that he had recently started taking Lexapro and was attempting to return to work

---

[1] The policy establishes that "TOTAL DISABILITY and TOTALLY DISABLED mean that because of Injury or Sickness the Person cannot perform the material and substantial duties of his regular occupation." (AR at 919). Furthermore, it defines "SICKNESS" as "illness, bodily disorder, disease, Mental Illness, or pregnancy" and "Mental Illness" as "any condition classified as a mental disorder in the *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders* . . . " (AR at 918 & 916).

4

part-time, over the objections of Dr. Patterson. (AR at 789). Plaintiff returned to work part-time on November 14, 2008, during which time DRMS continued to pay Plaintiff benefits under the "Partial Disability" provision of the policy. (AR at 783, 785). Plaintiff gradually increased the number of days he was working and returned to work full-time on February 24, 2009. (AR at 734).

Less than six months later, on August 20, 2009, Plaintiff ceased work again, and filed a claim for a Recurrent Disability under the policy. (AR at 703, 712-16, 720-21). He identified his reason for ceasing work as issues related to his bipolar disorder. (AR at 721). In support of his renewed claim, Dr. Joseph Lucas, Plaintiff's psychiatrist, submitted a Mental Capacities Evaluation form and Attending Physician's Statement, which indicated that Plaintiff had been diagnosed with Type II Bipolar Disorder and was currently depressed. (AR at 712-16). Dr. Lucas noted that information regarding Plaintiff's physical impairments should be sought from Dr. Patterson. (AR at 716). Dr. Patterson submitted an Attending Physician's Statement on August 21, 2009, and noted that Plaintiff's disabling condition -- depression with bipolar features -- was being treated by Dr. Lucas. (AR at 685-86). In response to questions regarding Plaintiff's *physical* impairment, Dr. Patterson indicated that Plaintiff could perform medium level work. (AR at 686).

Thereafter, Jacqueline Litif, a nurse medical consultant, reviewed Plaintiff's renewed claim and noted that the information provided did not clearly indicate any changes with respect to Plaintiff's condition. (AR at 678). Nurse Litif sought additional information from Dr. Lucas, who responded that Plaintiff's medication had been changed in July, but his symptoms had not resolved. As a result, Plaintiff decided to go on disability until he could gain an adequate clinical response. (AR at 665). Nurse Litif also asked Dr. Lucas if Plaintiff's physical problems

5

contributed to his depression and if tests had been done to determine if there was a physical cause for his cognitive issues. (*Id.*). Dr. Lucas's answer was inconclusive, as he reported that Plaintiff had suffered decreased attention and subjective complaints of decreased short term memory in February 2008 while suffering from a steroid induced manic episode, but that Plaintiff had not been under his care at that time. (*Id.*).

By letter dated September 24, 2009, DRMS approved Plaintiff's renewed claim and reinstated his benefits. (AR at 658-59). On March 15, 2010, Plaintiff submitted a statement in support of his continuing disability claim, in which he indicated that the cause of his disability was bipolar disorder and his primary complaints were anxiety, depression, inability to focus, lack of confidence, loss of motivation, and memory loss. (AR at 628-29). Plaintiff reported that his daily activities included sleeping, watching television, doing yard work, walking, using the computer, and worrying. (AR at 629). By letter dated May 7, 2010, DRMS notified Plaintiff that his benefits would not be payable beyond January 31, 2011, because they were administered in accordance with the policy's Mental Illness Limitation. (AR at 615-17). DRMS requested that Plaintiff provide additional medical documentation if he intended to claim a physical limitation that would prevent him from working as of February 1, 2011. (*Id.*).

On or about July 15, 2010, Dr. Lucas submitted an additional Attending Physician's Statement, dated April 9, 2010. (AR at 608-09). He reported Plaintiff's disabling condition was "Bipolar disorder – steroid induced manic episode," and his current symptoms included racing thoughts, inattention, insomnia, and anxiety. (AR at 608). He also stated that Plaintiff "should not take steroids (unless it is medically <u>urgent</u>)." (*Id.*) (emphasis in original). During a telephone call on October 29, 2010, Plaintiff informed a DRMS representative that he was seeing Dr. Patterson for his cholesterol, sleep issues, and back problems. (AR at 498). Plaintiff stated he

did not remember when he last saw a specialist for his back, but a 2010 MRI ordered by Dr. Patterson showed no significant changes. (*Id.*). Plaintiff reported no side effects from taking Ultracet, his prescribed pain medication. (*Id.*). Plaintiff's activities include fishing, walking, vacuuming, washing dishes, and grocery shopping. (*Id.*). Plaintiff also indicated he "is good if he sits for an hour straight [and] can probably stand a little longer than that." (*Id.*). When asked what precluded him from working, Plaintiff stated that "his back is an issue but the bigger issue is bi-polar, not being able to focus, or think positively, [and having] negative thoughts." (*Id.*). He specified that his back condition did not prevent him from performing as a CEO, "but in terms of being problematic in meetings, it definitely contributes to not being able to do [the] job effectively." (*Id.*). On that note, Plaintiff added that "[m]eeting time is important" and that "[h]e would be self-conscious to excuse [himself] to get [his] back stretched." (*Id.*).

By letter dated November 24, 2010, DRMS again notified Plaintiff that his benefits would not be payable beyond the policy's Mental Illness Limitation period. (AR at 615-17). DRMS advised that "[w]e are aware you have a back condition. In order for us to determine whether a physical impairment is supported, please have the physician treating you for your back condition fully complete the enclosed [Attending Physician's Statement]." (AR at 492). Subsequently, Plaintiff submitted a letter, dated December 3, 2010, in which he stated, "[w]hen I first saw Dr. Lucas, after a referral by Dr. Patterson, he told me that the Bi-Polar condition and related symptoms would have been triggered by the spinal block I received due to my back problems. So my question is since this entire mental health issue was caused by the back problems, would the company re-consider the 24 month limitation?" (AR at 416). On December 6, 2010, on a telephone call with a DRMS representative, Plaintiff repeated that "Dr. Lucas told

him his mental health issues are likely a result of the steroid he received and that he was predisposed to the mental health issues (bi-polar)." (AR at 413).

As requested, Plaintiff had Dr. Patterson complete another Attending Physician's Statement in December 2010, after which it was submitted to DRMS. (AR at 154-55). When asked on the form for his current diagnosis, Dr. Patterson directed readers to his September 15, 2010 office visit note, in which he noted that Plaintiff had a recent worsening of the left sciatica, persistent right sciatica, improved sleep pattern, degenerative disc disease, restless leg symptoms, and depression, along with various other conditions. (AR at 154, 146). He did state in the December 2010 Attending Physician's Statement that Plaintiff had trouble lifting, standing, riding, and sitting for long periods, but opined that Plaintiff was capable of clerical/administrative (sedentary) activity. (AR at 154-55).

On January 13, 2011, Nurse Litif reviewed the additional information provided in support of Plaintiff's claim and concluded that there was nothing in the medical records to indicate that Plaintiff "would be unable to perform sedentary activity with the ability to change positions on a sustained basis." (AR at 404). For further clarity, however, Nurse Litif wrote to Dr. Patterson for more information regarding Plaintiff's ability to perform a sedentary occupation. (AR at 393-94). Dr. Patterson curtly responded that he did not perform disability examinations. (AR at 394). After receiving this response, DRMS contacted Dr. Patterson's office, requesting a prescription for Plaintiff to undergo a functional capacity evaluation ("FCE"). (AR at 116). Dr. Patterson complied, writing a prescription for such an examination. (AR at 384).

In February 2011, Plaintiff submitted to an FCE performed by Bledsoe Occupational Therapy, Inc. (AR at 36-65). The FCE, which measured Plaintiff's physical rather than mental capabilities, revealed Plaintiff could occasionally lift, carry, pull, and push 20 pounds or more;

could frequently stand and walk (up to 4.5 hours during the work day); and could sit constantly (8 hours). (AR at 362). These results indicated that Plaintiff was capable of functioning at the full range of light work. (AR at 361).

Also in February 2011, Dr. Patterson referred Plaintiff to a neurosurgeon, Dr. Colby Maher. (AR at 143). After meeting with Plaintiff numerous times and having him undergo a variety of studies (AR at 338-49), Dr. Maher stated that the cause of Plaintiff's pain symptoms was "still a bit of a mystery," but concluded that he possibly suffered from "piriformis syndrome." (AR at 349).

DRMS sent copies of Plaintiff's February 25, 2011 FCE report to Drs. Maher and Patter, and requested comments regarding the report's conclusions about Plaintiff's abilities. (AR at 256, 280). Both Drs. Maher and Patterson agreed that Plaintiff could function at the light physical demand level. (AR 257-58, 278-79). Thereafter, Nurse Litif reviewed the opinions of Drs. Patterson and Maher, along with the FCE and Plaintiff's medical records. (AR at 253). Based on this review, Nurse Litif concluded that it was reasonable to expect that Plaintiff would be capable of sustained light physical function. (*Id.*).

By letter dated May 4, 2011, DRMS advised Plaintiff that he was no longer eligible for long-term disability benefits under the policy. (AR at 238-41). DRMS reiterated that his prior benefits had been approved pursuant to the policy's Mental Illness Limitation provision and that those benefits were exhausted on January 31, 2011.[2] (*Id.*). The letter referenced the following: Plaintiff's FCE results, which indicated Plaintiff could function at the light physical demand level; the corroborating opinions of Drs. Patterson and Maher; the DRMS Medical Consultant's

---

[2] Although it has no bearing on the court's *de novo* evaluation of Plaintiff's claim for long-term disability benefits, Defendants have represented to the court — and Plaintiff has not contested — that DRMS provided Plaintiff with the full amount of benefits payable under the Mental Illness Limitation, plus additional benefits while it continued to evaluate his claim, despite the absence of a contractual or statutory obligation to do so. (Doc. #31 at 24).

file review; and DRMS's vocational assessment, which confirmed Plaintiff's occupation as CEO was classified as a sedentary occupation and allowed Plaintiff to change positions from sitting to standing as needed. (*Id.*). DRMS also acknowledged Plaintiff's award of SSDI benefits, and advised that the Social Security Administration's policies and procedures for determining disability were distinct from those set forth in the applicable policy. (*Id.*). Plaintiff was advised of his right to appeal the decision. (*Id.*).

Plaintiff appealed DRMS's decision by letter dated October 31, 2011. (AR at 186-87). In support of his appeal, Plaintiff submitted his SSDI Notice of Award, additional medical records from Dr. Patterson, an Independent Medical Evaluation ("IME") from Dr. Kenneth Jaffe, a questionnaire completed by Dr. Jaffe, a physical capacities evaluation filled out by Dr. Jaffe, a vocational assessment by John M. Long, a statement from David Bledsoe, and the transcript of a sworn examination of Dr. Patterson. (AR at 136-37, 142-51, 162-63, 164-66, 167, 67-68, 184, 69-89).

The aforementioned IME was conducted by Dr. Jaffe on September 22, 2011. (AR at 162). The resulting report noted that Plaintiff ambulated without assistive devices, was alert and oriented, was able to flex at the waist about 80 degrees, and showed no signs of muscle atrophy in his lower extremities. (AR at 163). However, Dr. Jaffe did report that there was some tenderness in the lower lumbar region near the sciatic notch and mild tightness in the piriformis tendon. (AR at 163). Dr. Jaffe also diagnosed Plaintiff with lumbar degenerative disk disease (and resulting foraminal stenosis) and concluded that Plaintiff's "underlying medical condition could reasonably be expected to cause serious distraction from job tasks and failure to complete job tasks in a typical eight hour work day." (*Id.*). Furthermore, Dr. Jaffe noted that Plaintiff was

"not able to sit or stand for any extended lengths of time because of the severe pain in his lower back." (*Id.*).

Dr. Jaffe also completed a questionnaire, noting that he believed Plaintiff would experience pain that could distract him from work and that side effects from his pain medication, Neurontin, "are causing problems as it relates to cognition." (AR at 164). Therein, Dr. Jaffe also reported that Plaintiff's "major times of dysfunction and pain are when he sits for any extended period of time (greater than 30 minutes)." (*Id.*). In a separate physical capacities evaluation, Dr. Jaffe estimated that Plaintiff could sit, stand and walk for less than one hour at a time, sit for a total of 3 hours in an 8 hour work day, stand and walk for a total of 3 hours in an 8 hour day, frequently lift up to 20 lbs., and occasionally lift up to 50 lbs. (AR at 167).

The report prepared by John Long was dated November 1, 2011. (AR at 67-68). In it, Mr. Long -- a certified disability management specialist -- cautioned that "it is important to understand that a person can have the physical capacity to work, yet still be unable to sustain competitive employment." (AR at 68). He also opined that "pain, postural limits, and the side effects of his medication would preclude [Plaintiff from] being able to maintain the persistence and pace [of] work [and] adequate attendance necessary to function in any sort of competitive employment." (*Id.*). In contrast, the statement from David Bledsoe reiterated the occupational therapist's prior conclusion that Plaintiff could perform at the light physical demand level and noted that "[Plaintiff] performed well on the FCE." (AR at 184).

Dr. Patterson submitted to a sworn examination by Plaintiff's counsel on October 26, 2011. During the examination, Dr. Patterson backtracked on his previous concurrence with Mr. Bledsoe's FCE, explaining that "from the standpoint of could he lift or could he be at a job for a period of time with light work, I wasn't thinking about the potential side effects with the

11

medications and his trouble focusing at that time." (AR at 81-82). Expounding on his new perspective, Dr. Patterson stated that "[Plaintiff's] pain level is significant enough that he would not be able to function at work" and concluded that "I don't think [Plaintiff is] able to function [as a CEO] [while] taking the medications, and, if he was not taking the medications, I think the pain level would be so much that he would not be able to function because of the pain." (AR at 82, 84).

Having received these additional materials from Plaintiff, DRMS referred Plaintiff's file to Dr. Sharon Hogan for a medical review on January 20, 2012. (AR at 48-54). Dr. Hogan noted the need to determine whether Plaintiff's reported cognitive dysfunction was organic or psychological/psychiatric in etiology, recommending that Plaintiff undergo neuropsychological evaluation with validity testing. (AR at 53). Plaintiff's counsel objected to the recommended evaluation, arguing that the policy did not provide for neurological testing and advising Plaintiff not to submit to such testing. (AR at 32). DRMS urged counsel to reconsider, citing the "Physical Examination" provision of the policy,[3] but Plaintiff's counsel remained steadfast in his advice that Plaintiff refuse to be so examined. (AR at 27, 25).

Accordingly, Dr. Hogan completed her review without the benefit of additional testing. (AR at 12-21). In her March 8, 2012 report, Dr. Hogan noted that the available medical data on file supported the following physical restrictions:

> May occasionally lift up to 20 lbs. and frequently up to 10 lbs.;
> May occasionally bend, stoop, crouch and squat;
> Can occasionally bend; and

---

[3] The policy's Physical Examination provision provides:

> AUL, at its own expense, has the right to have a Person examined to determine the existence of any Disability that is the basis for a claim. This right may be exercised as often as is reasonably necessary, as determined by AUL and must be performed by a Physician of AUL's choice.

AR at 928.

Should be allowed to alternate between sitting, standing and walking as needed.

(AR at 20). Dr. Hogan noted that Plaintiff returned to work for nearly six months in 2009 and only stopped due to issues with cognitive functioning associated with bipolar disorder, not back pain. (*Id.*). In sum, Dr. Hogan acknowledged that Plaintiff may have cognitive impairment, but concluded that the weight of evidence (without neuropsychological testing) indicated that Plaintiff's cognitive impairment was due to psychiatric illness and/or psychological factors, not any physical impairment. (*Id.*).

By letter dated March 9, 2012, DRMS upheld its termination of Plaintiff's claim. (AR at 7-11). DRMS explained its decision as follows:

> In summary, your client has had pain complaints for a number of years and continued to work. However, according to the information in your client's claim file, the precipitating factor which caused your client to cease work was due to a psychiatric condition. He was treated for mental illness. The maximum benefits were paid due to the mental and nervous limitation noted above. Your client has complained of cognitive problems which he attributed to the medications he is taking for his back pain. However, the medical documentation provided to date indicated the cognitive impairment is due to a psychiatric illness. Based on the lack of medical evidence to support a physical condition that would prevent your client from working in his own occupation, the denial was appropriate and the claim will remain closed.

(AR at 10). Plaintiff was advised of his right to sue for benefits under ERISA. (*Id.*).

### III.   Standard of Review

Although "ERISA provides no standard for reviewing decisions of plan administrators," *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004), it is well settled that "[a] denial of benefits under an ERISA plan must be reviewed *de novo* 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1549 (11th Cir. 1994) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115

13

(1989); *see also Williams*, 373 F.3d at 1137. Here, both parties agree that the case should be reviewed under the *de novo* standard. (Doc. #29 at 14; Doc. #31 at 24). This standard "offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision." *Williams*, 373 F.3d at 1137. Plaintiff bears the burden of proving that he is disabled within the meaning of the policy (*i.e.*, that he is entitled to long-term benefits). *Glazer v. Reliance Standard Life Insurance Co.*, 524 F.3d 1241, 1247 (11th Cir. 2008); *Horton v. Reliance Standard Life Insurance Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

**IV.  Conclusions of Law**

After careful review of the administrative record and the parties' briefs, and for the reasons stated below, the court concludes that Defendants' motion should be granted and Plaintiff's denied.

**A.  Overview of the Parties' Arguments in Support of Judgment as a Matter of Law**

Plaintiff's Memorandum of Law (Doc. #29) asserts, in essence, that the evidence presented on appeal clearly demonstrates that Plaintiff suffered from a disability other than the mental illness on which he based his original long-term disability claim. Defendants' Memorandum of Law (Doc. #31) argues that Plaintiff is not entitled to long-term benefits, because (1) he failed to demonstrate that he suffered from a disability not encompassed by the Mental Illness Limitation, and (2) he breached the policy by failing to submit to a neuropsychological evaluation. The parties' arguments are addressed below.

**B.  Plaintiff Has Failed to Carry His Burden of Demonstrating That He Has a Disability That Entitles Him to Benefits Under the Policy**

Despite his assertions to the contrary, Plaintiff has failed to sufficiently demonstrate that he has a disability entitling him to benefits under the policy. Indeed, having already exhausted

his benefits under the Mental Illness Limitation by February 2011, Plaintiff's only hope of continuing to collect long-term disability benefits was to identify a different disabling condition, specifically one with a physical, rather than a mental or psychological source. However, DRMS determined that Plaintiff did not present sufficient evidence to show that his cognitive difficulties -- which prevented him from performing his previous position as CEO -- were the product of his well-documented spine and lumbar issues. After *de novo* review, the court reaches the same conclusion.

Throughout the entire claims process, Plaintiff's requests for long-term disability benefits have been based on his impaired cognitive function. Initially, Plaintiff's cognitive difficulties were attributed to mental illness, namely bipolar disorder, and it was in this context that DRMS approved Plaintiff's August 2008 benefits request. (AR at 890, 848). At the time, there were fleeting suggestions that his mental condition could be related to his back troubles,[4] but the overwhelming narrative -- as conveyed by both Plaintiff and his doctors -- was that the disabling cognitive impairment was caused by his bipolar disorder. (AR at 721, 712-16, 685-86, 628-29).

After Plaintiff was informed that his benefits were set to expire pursuant to the Mental Illness Limitation, Plaintiff and his doctors/evaluators began to advance two other theories as to his diminished cognitive function: (1) Plaintiff's mental illness (bipolar disorder) was brought on by a steroid injection that had been administered to him for back pain (AR at 416, 413), and (2) Plaintiff's back/spinal pain was so severe that it clouded his mind (AR at 163-64, 84, 81-82, 68). However, these theories were far from universally accepted, as numerous doctors/evaluators concluded that Plaintiff did not have any physical limitations that wholly prevented him from performing his prior job as CEO. (AR at 361, 278-79, 257-58, 253, 184, 154-55).

---

[4] *See* Treatment Notes of Therapist James Cotton, AR at 788 ("The chronic back pain has led to both anxiety and depression"); Diagnosis of Dr. James Lucas, AR at 608 ("Bipolar disorder – *steroid induced* manic episode") (emphasis added).

Ultimately, Dr. Hogan, the doctor employed by DRMS to review Plaintiff's file, was unable to conclusively determine that Plaintiff's diminished cognitive capacity was tied to his spine and lumbar problems. (AR at 20). The court's *de novo* review reaches the same conclusion. As has been exhaustively recounted above, the opinions of the medical and occupational professionals that considered Plaintiff's case were split, and Plaintiff presented no other evidence regarding the root of his cognitive impairment. The request to assess Plaintiff and definitively identify a link between Plaintiff's weakened mind and ailing body was rebuffed by Plaintiff's counsel, leaving the court with little concrete basis for concluding that Plaintiff's disabling condition, cognitive deficiency, was physical in origin. As such, Plaintiff has failed to carry his burden of showing that he was entitled to benefits under the plan, rendering Defendants' motion due to be granted and Plaintiff's motion due to be denied.

    **C.**    **Even Assuming *Arguendo* the Existence of a Qualifying Disability, Plaintiff's Entitlement to Benefits Was Forfeited When He Refused to Undergo the Neuropsychological Examination Requested by DRMS**

However, even assuming *arguendo* that Plaintiff's disabling condition was such that he was entitled to benefits, his right to claim them was forfeited by his breach of the group insurance policy. Indeed, by refusing to submit to neuropsychological testing as requested by DRMS, Plaintiff violated the policy's Physical Examination provision ("AUL, at its own expense, has the right to have a Person examined to determine the existence of any Disability that is the basis for a claim") and triggered one of the policy's termination clauses (benefits "will cease on the EARLIEST of the following . . . (6) the date the Person refuses to allow an examination requested by AUL"). (AR at 928, 933). Plaintiff based his refusal to be evaluated on the argument that the policy's Physical Examination provision did not encompass neuropsychological evaluations (AR at 25, 32), but such an argument strains the bounds of both

16

contractual interpretation and logical reasoning. First, although the relevant provision is entitled "Physical Examination," that label does not control.[5] The provision itself provides for no limitation on the type of examination that may be performed, only noting that Defendant maintains the "right to have a Person examined to determine the existence of any Disability . . ." (AR at 928). Second, it turns logic on its head for Plaintiff to claim that his cognitive disability is physical in nature, but then balk at submitting to an exam -- regardless of its methodology -- that is meant to determine whether a physical or mental condition caused the cognitive deficiency. This is the case because even if the policy could be read as imposing a limitation that any DRMS-required examination be designed or administered to detect a physical impairment, that does not preclude testing that will aid in a diagnosis of exclusion (*i.e.*, *per exclusionem*). Thus, an exam which excludes the possibility of a physical deficiency, and thus indicates, for example, a diagnosis of a mental impairment, fits squarely within that scope. Indeed, it follows logically that such an exam result could very well lead to an opposite conclusion — *e.g.*, a medical finding that excludes a diagnosis of a mental (or psychological) limitation and indicates that a condition is caused by a physical impairment. Accordingly, Plaintiff is not entitled to benefits under the plan, and Defendants' motion is due to be granted, while Plaintiff's motion is due to be denied.

---

[5] "[T]he heading of a [contract's] section cannot limit the plain meaning of the text. For interpretive purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain." *Brotherhood of Railroad Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 529 (1947) (internal citations omitted). Although the preceding quote was made in specific reference to statutory construction, it applies with equal force to the interpretation of contracts, including the policy at issue here.

## V. Conclusion

For the reasons stated above, Defendants' Motion for Judgment as a Matter of Law (Doc. #30) is due to be granted and Plaintiff's Motion for Judgment as a Matter of Law (Doc. #28) is due to be denied. A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this August 8, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE